



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**500 Indiana Avenue, N.W., Suite 5000**
**Washington, D.C. 20001 Teléfono: (202) 879-1133**

_____
                                    Demandante

       contra

                                    Número de Caso: _____

_____
                                    Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                          *SECRETARIO DEL TRIBUNAL*

Nombre del abogado del Demandante
LPP Law
                                          Por: _____
Dirección                                              Subsecretario
_____

                                          Fecha _____
Teléfono
_____

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시요      የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Filed
D.C. Superior Court
08/00/2015 16:22BM
Clerk of the Court

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

Civil Division

Civil Actions Branch

| | | |
|---|---|---|
| ABIGAIL RODRIGUEZ<br>11002 Stillwater Avenue<br>Kensington, Maryland 20895<br>  *Plaintiff* | )<br>)<br>)<br>)<br>) | |
| v. | )<br>) | Case No. __2015 CA 006067 B__ |
| NATIONAL GEOGRAPHIC SOCIETY<br>1145 17th Street NW<br>Washington, DC 20036<br>  *Defendant* | )<br>)<br>)<br>)<br>) | |
| JEFF HASLER<br>1145 17th Street NW<br>Washington, DC 20036<br>  *Defendant* | )<br>)<br>)<br>)<br>) | |
| TIA FREEMAN-EVANS<br>1145 17th Street NW<br>Washington, DC 20036<br>  *Defendant* | )<br>)<br>)<br>) | |

## **COMPLAINT**

Plaintiff Abigail Rodriguez ("Ms. Rodriguez"), by and through counsel, LPP Law and

Lynn Perry Parker, Esquire, files this Complaint against Defendants National Geographic

Society ("NG"), Jeff Hasler ("Mr. Hasler"), and Tia Freeman-Evans ("Ms. Freeman-Evans") and

in support thereof, states as follows:

### **Subject Matter Jurisdiction**

1.  This Court has subject matter jurisdiction over the claims in this matter pursuant to D.C.

Code Ann. § 11-921 and 29 U.S.C. § 1132(e)(1).

## Personal Jurisdiction

2.    This Court has personal jurisdiction over Defendants pursuant to D.C. Code Ann. § 13-423(a)(1) because the allegations and claims for relief herein arise from Defendants' transaction of business in the District of Columbia.

## Parties

3.    At all times hereinafter mentioned, Ms. Rodriguez was and is a resident of Maryland.

4.    At all times hereinafter mentioned, NG was and is a nonprofit corporation with its headquarters located in Washington, DC.

5.    At all times hereinafter mentioned, Mr. Hasler was and is the Executive Vice President of Development and Production at NG.

6.    At all times hereinafter mentioned, Ms. Freeman-Evans was and is the Director of Human Resources for NG, and in that capacity administers NG's human resource policies, including its severance and pension policies.

## Facts

7.    Ms. Rodriguez was employed by NG in development and production at NG's headquarters for nearly ten years until her termination on April 16, 2015.  In that time, she worked for dozens of producers and multiple managers.  She never received a poor performance review and was repeatedly given raises due to her performance.

8.    At all times relevant to this Complaint, Ms. Rodriguez was responsible for the creation and development of video content for primarily two of NG's clients, National Geographic Wild Channel ("Wild") and National Geographic Channel.

9.    For approximately 8 months prior to her termination, Ms. Rodriguez's primary development responsibility was for Wild.

10.   Besides senior management, Ms. Rodriguez was the only member of her team working directly with Wild and the only team member representing NG Studios in the Critical Species NG Society cross-platform initiative group.

11.   The supervisor responsible for Ms. Rodriguez's termination, Jeff Hasler ("Mr. Hasler"), joined NG in October 2014.  He works out of New York and comes to the DC location monthly.

12.   All development projects were tracked on a daily basis.  Mr. Hasler required Ms. Rodriguez and the five other team members (Katy Wynn, Alex Wenchel, Josh Patterson, Michelle Laird, and Erin Krozek) to meet by telephone every morning, Monday through Friday, at 9:30.  In DC, Ms. Rodriguez, Ms. Wynn, and Mr. Wenchel would place a conference call to Mr. Hasler, Mr. Patterson, Ms. Laird, and Ms. Krozek in New York.  At each morning meeting, Mr. Hasler set priorities and schedules for the tasks he expected each team member to perform.  Deadlines were communicated verbally, summarized and confirmed by an email from Ms. Laird, tracked through a system called Trello, and managed on a Google calendar.

13.   In addition to the daily morning meetings, the development group had weekly operations meetings on Mondays at 2:30 p.m. at which they discussed overall goals, deadlines, and contracts.  As projects evolved and were reviewed by Mr. Hasler and the clients, so did the deadlines and priorities.

14.   In addition, the development group had creative meetings on Fridays at 2:00 p.m.

15. All content created by Ms. Rodriguez had to be thoroughly vetted by Mr. Hasler. He required his approval before any treatment[1], budget, or schedule could be sent to a client. He also required that he be copied on all email communications with clients.

16. On December 16, 2014, while Mr. Hasler was in the D.C. office, he had a conversation with Ms. Rodriguez in the hallway of NG wherein he asked Ms. Rodriguez to put together a list of young talent[2] to support a pitch to the Travel Channel.

17. It is customary at NG for one member of the development group to lead a project while the other members serve as support.

18. Ms. Krozek was the lead development team member for the Travel Channel talent project.

19. On December 17, 2014, Ms. Rodriguez emailed the development group to begin brainstorming potential candidates.

20. Ms. Rodriguez received a 3% salary bonus for good performance in January 2015.

21. On January 20, 2015, Ms. Rodriguez sent Mr. Hasler, Ms. Krozek, and Mr. Patterson a list of young talent. On January 22, Mr. Hasler apologized to Ms. Rodriguez via email for his delay in reviewing her submission. Sometime after January 22, Mr. Hasler had a chance to review the list.

22. Ms. Rodriguez, Mr. Hasler, Ms. Krozek, and Mr. Patterson had a conference call in late January-early February to discuss the list. Mr. Hasler eliminated some of the suggested talent on the list and requested that Ms. Rodriguez get more footage of others. The group also discussed whether they should sign this talent to holding deals. Mr. Hasler decided they should not.

---

[1] A written proposal used to pitch a program to a client or buyer.
[2] Individuals to serve as the on-screen characters or hosts for the productions.

23.   In the following weeks, Ms. Rodriguez was directed in the daily and weekly meetings to focus on other projects, including *Bible Countdown*, *Mission Critical*, *I Bought A*, *Border Vet*, *Animal Selfie*, *NG@Nite*, and other projects for NG Studios. She focused specifically on the three projects for Wild: *Mission Critical*, *I Bought A* and *Animal Selfie*. All of these projects were developed directly with the client, Janet Han Vissering, supported by the Critical Species initiative group, and were on brand, on mission, and featured NG Talent and Grantees.

24.   Since January 2015, Ms. Rodriguez sold one pilot (*Animal Selfie*), and two series (*I Bought A* and *Mission Critical*) with three episodes each for a total of seven hours of programming and a combined budget of over $2 million. These sales were an exceptional accomplishment.

25.   The original treatment Ms. Rodriguez created for *Mission Critical* was sent to Mr. Hasler for review and he approved it via email on February 4, 2015.

26.   Allen Feur, who is responsible for production management, used Ms. Rodriguez's treatment to prepare a budget and schedule for *Mission Critical*. Mr. Feur's budget and schedule for *Mission Critical* was approved by Mr. Hasler and the *Mission Critical* package was sent to the client.

27.   *Mission Critical* was "greenlit," which means it was accepted and approved by the client to go forward. Ms. Rodriguez was praised and congratulated by both Brooke Runnette, President of NG Studios, and Mr. Hasler in emails circulated to other NG employees.

28.   *Mission Critical* was assigned to Jared Lipworth to oversee production.

29.    In early February, Ms. Rodriguez was directed to refocus on Travel Channel talent and pull together bios and Skypes[3].

30.    Ms. Rodriguez and Mr. Hasler met on February 10 to discuss the next steps for *Mission Critical* and *Animal Selfie* and he proposed that she potentially stay involved with *Animal Selfie* as a writer to continue her professional development.

31.    On February 13, Ms. Rodriguez delivered bios and Skypes of the Travel Channel talent.

32.    On February 17, Ms. Rodriguez received a call from Ms. Krozek, who is based in New York, communicating that the bios and Skypes were not what Mr. Hasler wanted.  Based on her conversation with Ms. Krozek, the lead on the project, Ms. Rodriguez followed up with an email confirming her understanding of what was desired and expressed some frustration that it had not been clearly articulated previously.  Mr. Hasler responded with new directions and a new deadline.

33.    Ms. Rodriguez reworked the material and sent it out on February 25, as required.

34.    Ms. Rodriguez heard nothing further from Mr. Hasler nor Ms. Krozek and assumed they were satisfied with the product.

35.    Pursuant to a requirement implemented in an all-NG staff meeting in January that all personnel submit goals to their supervisors by February 28, Ms. Rodriguez submitted her goals to Mr. Hasler prior to the February 28 deadline.  Mr. Hasler was supposed to review her submission and schedule a meeting with Ms. Rodriguez to discuss the goals, modify them as needed, and implement the means to achieve the desired objectives.  Mr. Hasler never responded to Ms. Rodriguez, presumably because they were in

---

[3] Written biographies and background information for the talent and recorded Skype calls or "character reels" to review the talent's on-camera persona.

communication every day and Mr. Hasler determined how she would spend her time and use her skills and experience on a daily basis.

36.   On February 27, Ms. Rodriguez left the office early because she had to address a household service issue, but also because she was on a tight deadline to deliver a *Cats vs. Dogs* treatment by the end of the week and needed a quiet place to write. She often worked from home or off-site on days when it was challenging to concentrate and write in a cubicle. Mr. Hasler emailed her to ask that she come to a meeting. She wrote back explaining that she was at home. Mr. Hasler expressed his concern regarding her absence from the office. Ms. Rodriguez easily met her *Cats vs. Dogs* deadline.

37.   In early March, all NG staff received an email that it was time for first quarter goal reviews. No goal review meeting was scheduled for Ms. Rodriguez by Mr. Hasler.

38.   On March 12, Ms. Runnette sent an email to Ms. Rodriguez, Mr. Hasler, Mr. Feur, Mr. Lipworth and Brian Lovett expressing concerns that Mr. Lipworth had raised about implementation of *Mission Critical* and the need to rework the budget. Mr. Lipworth and Mr. Feur were assigned the task of addressing the production budget concerns.

39.   Ms. Laird invited Ms. Rodriguez to attend a March 17 meeting with Mr. Hasler, Ms. Wynn, Ms. Krozek, and clients from the Travel Channel from 1:00 to 2:30 p.m. The reworked materials that Ms. Rodriguez had prepared were presented to the clients. The Travel Channel representatives requested holding deals with two of the characters presented. That same day, Mr. Hasler sent an email to Ms. Runnette expressing his pleasure at how things went in the meeting.

40.   On March 18, Mr. Hasler was in the D.C. office and met with Ms. Rodriguez alone at 8:45 a.m. at Ms. Rodriguez's request. In that meeting, Mr. Hasler mentioned that he, too,

was working with Mr. Lipworth and Mr. Feur to rework the production budget for *Mission Critical* as Ms. Runnette had requested on March 12.  At no time during this meeting did Mr. Hasler criticize, reprimand, or suggest that Ms. Rodriguez had performed poorly or did anything wrong regarding either *Mission Critical* or the Travel Channel projects.

41.   Ms. Rodriguez also sought clarification regarding the objective of the growth plan which Mr. Hasler had referenced during his visit to Washington, DC on or about December 19th.  During that December meeting he spoke of putting Ms. Rodriguez and Ms. Krozek on a "growth plan" -- which he explained was defining the next step in career development, title, and salary that they should be working towards.  In the March 18 meeting, Ms. Rodriguez followed up and asked whether a rate increase or a title change, specifically to include her role with Wild, were part of the plan.  Mr. Hasler asked to postpone the conversation to the fall due to budget constraints.

42.   In the same morning meeting, in a very casual manner, Mr. Hasler again raised the issue regarding Ms. Rodriguez's working from home on February 27.  Mr. Hasler encouraged her to work in the office and explained that she needed to set an example for her younger colleagues.

43.   Also on March 18, at 10:30 a.m., Ms. Rodriguez met with Mr. Lipworth and Rachel Wisenant to discuss possible deal arrangements with the talent solicited to take part in the *Mission Critical* program.  Ms. Rodriguez was responsible for calling the meeting.  The three discussed the shooting schedule, role of the photographers, and rates that the talent desired so that Ms. Wisenant could begin drafting the talent engagement agreements.

There was no discussion about Ms. Rodriguez's performance or any mention of concerns about any action she did or did not take.

44.  Neither Mr. Hasler nor Mr. Feur attended the March 18, 10:30 a.m. meeting.

45.  During this mid-March time frame, Ms. Rodriguez was three months pregnant with twins.  She had begun to inform NG colleagues and clients, including (but not limited to) Ms. Wynn, Stephanie Atlas, Charlie Parsons, Chad Cohen, Ted Duvall, and Sal Vecchio and several other colleagues actually asked her if she was pregnant.  Due to her short stature and slender physique, her pregnancy was clearly noticeable.

46.  To follow up on the March 17 meeting decision to obtain holding agreements for the Travel Channel project, on March 23, Ms. Rodriguez contacted two of the Travel Channel talent considerations, Cedar Wright and Alex Hunnold.  She learned that they had concerns about signing deals with NG and the Travel Channel that they had not previously revealed.  She immediately notified Mr. Hasler through an email in which she expressed full responsibility for not securing the talent before the pitch was made to Travel Channel, despite the fact that Mr. Hasler had explicitly instructed her not to enter into holding deals prior to the March 17 meeting with the Travel Channel.  Mr. Hasler expressed his unhappiness in a curt email and allowed Ms. Rodriguez to assume the blame for not having "everything buttoned up."

47.  On March 27, Ms. Rodriguez learned that despite conversations to the contrary a few days earlier, a third Travel Channel talent consideration, "Ella," was having second thoughts about working with the Travel Channel given her academic background and the lack of familiarity of the Travel Channel in the United Kingdom.  Ms. Rodriguez immediately emailed Mr. Hasler and Ms. Krozek and suggested Mr. Hasler and Ms.

9

Krozek address Ella's concerns over the phone prior to sending Ella any paperwork. Ms. Krozek responded agreeing that Mr. Hasler should speak with Ella on the phone "asap." Ms. Rodriguez heard nothing further regarding Ella.

48. On April 2, 2015, at 4:00 p.m. in a development team meeting attended by Mr. Hasler, Mr. Lovett, Mr. Patterson, Ms. Krozek, Ms. Laird, Mr. Wenchel, Ms. Wynn, and Ms. Rodriguez, both Mr. Hasler and Mr. Lovett spoke about their own obligations to more closely review budgets and schedules for development projects and referenced *Mission Critical* as an example.

49. In the April 2 meeting, Mr. Hasler also expressed frustration with the Travel Channel deal and that it fell through due to the talent not signing holding deals prior to the pitch to the Travel Channel. He never mentioned Ms. Rodriguez by name but it was clear to everyone in the room that he was blaming her. After Mr. Hasler left the meeting, but while all others were still in attendance, Ms. Krozek reminded everyone on the development team that Mr. Hasler had explicitly directed Ms. Rodriguez not to sign potential talent to holding deals in the Travel Channel project.

50. Mr. Wenchel and Ms. Wynn were so upset by Mr. Hasler's behavior in the meeting that they left the office at its conclusion.

51. Ms. Rodriguez was also very unnerved by the public and passive aggressive manner in which Mr. Hasler expressed his disappointment and projected blame onto her. She requested a meeting with Ms. Runnette to express her concerns that evening.

52. At approximately 5:00 p.m., Ms. Rodriguez met with Ms. Runnette, who reciprocated her alarm that Mr. Hasler had not spoken with Ms. Rodriguez directly. She encouraged Ms.

Rodriguez and stated that talent pulls out "all the time." She also said she would meet with Ms. Wynn and Mr. Wenchel the following day to address any of their concerns.

53.    On April 6, Ms. Rodriguez received an email reminder to meet with Mr. Hasler about her progress on goals. She spoke with her colleagues, Ms. Wynn and Mr. Wenchel, and they confirmed that they also had never received any feedback from Mr. Hasler about their goals and hoped they would get the opportunity to review them with him. Ms. Rodriguez had included in her list of goals a number of new initiatives to support the development group that she was eager to implement.

54.    Ms. Rodriguez met with the client representative for Wild, Ms. Han Vissering, on April 7, to discuss *Mission Critical*. Mr. Hasler took part in that meeting by telephone. Based on that meeting, Ms. Rodriguez believed (and still believes) that *Mission Critical* was on track and on schedule.

55.    Mr. Hasler's monthly visit to the D.C. office and meeting with Ms. Rodriguez was scheduled for April 16. She had planned to formally notify Mr. Hasler of her pregnancy in her face-to-face meeting with him. Instead, Mr. Hasler, having previously arranged to have Ms. Freeman-Evans join him in the meeting, terminated Ms. Rodriguez. Ms. Rodriguez was shocked.

56.    Mr. Hasler left the meeting after a few minutes. Ms. Freeman-Evans verbally summarized a memorandum Mr. Hasler had prepared to justify the termination for "poor performance" but Ms. Rodriguez was not permitted to read it. In sum, Ms. Rodriguez was informed that she was being terminated due to:

   1. The creation of a flawed production model on *Mission Critical*, and for shifting blame onto others for the failure at a March 18 meeting with Mr. Hasler, Mr. Lipworth, and Mr. Feur.

11

2. Failure to meet deadlines or follow directions on the Travel Channel project.
3. Failure to meet goals regarding weekly generation of talent for NG International Channel.
4. Failure to communicate with her manager regarding her work location.
5. Poor performance resulting in lost revenue for NG due to projects that failed to get greenlit.

57. Ms. Rodriguez told Ms. Freeman-Evans that she had no prior performance issues and had never been informed by Mr. Hasler of any poor performance – on the contrary, she had recently been praised. She was also shocked at the false and misleading allegations being read to her. She attempted to rebut and explain the inaccuracies, including the fact that the March 18 meeting that Mr. Hasler described never occurred. She also explained what she does as a developer and that the *Mission Critical* production model problem concerned budget issues for which she was not primarily responsible and that, in any event, Mr. Hasler had expressly approved all aspects of the project before it was sent to the client.

58. During the meeting, Ms. Rodriguez repeatedly asked if Ms. Runnette was aware of her termination. She couldn't believe that Ms. Runnette would support the termination because in their April 2 meeting, Ms. Runnette was very encouraging of Ms. Rodriguez and gave no indication that there were any concerns.

59. Ms. Rodriguez told Ms. Freeman-Evans that she had documentation (emails, phone records, and calendar information) that would rebut the allegations, and that she would send that documentation to her as soon as possible. Ms. Freeman-Evans said she would investigate the matter based on any new information provided.

60. Ms. Rodriguez was given a Separation Agreement in the form of a letter that stated, "In view of your service with National Geographic, a separation package (the "Separation

Agreement and Release"), **which is consistent with practice**, has been prepared for you." [Emphasis added.]

61. Ms. Rodriguez also asked Ms. Freeman-Evans twice to provide any paperwork pertaining to her NG pension fund, which Ms. Freeman-Evans refused to provide.

62. Following the termination meeting, Ms. Patricia Walden escorted Ms. Rodriguez up to her desk. Ms. Rodriguez picked up her purse and Ms. Walden took her laptop, phone, and badge.

63. Many of Ms. Rodriguez's colleagues gathered to watch her collect her belongings. Several were crying and trying to say goodbye to Ms. Rodriguez. Ms. Walden then advised Ms. Rodriguez not to get emotional, that it was time to leave, and escorted her out of the building. Ms. Rodriguez was humiliated. In her almost ten year tenure, only employees who had committed serious wrongdoing were publicly shamed and escorted out the door.

64. The following day, Friday, April 17, 2015, Ms. Rodriguez sent a detailed Memorandum with exhibits to Ms. Freeman-Evans explaining why terminating her for poor performance was wrong. She also communicated her fear of being denied unemployment benefits because of the classification of termination for "poor performance." She also reminded Ms. Freeman-Evans that she was four months pregnant with twins and was already a parent of an 18-month old.

65. Based on her position as NG's Director of Human Resources and her response in the termination meeting, Ms. Rodriguez assumed that Ms. Freeman-Evans would conduct a thorough investigation upon receipt of the documents.

66. Only two business days later, on April 21, Ms. Freeman-Evans responded to Ms. Rodriguez's Memorandum by email in which she stated that the termination for "poor performance" classification would not change and curtly stated that she would report the facts to the unemployment agency and whether Ms. Rodriguez would receive benefits was up to the agency to determine.

67. Ms. Freeman-Evans conducted no investigation after Ms. Rodriguez provided her Memorandum and exhibits.

68. On April 22, Ms. Rodriguez met with undersigned counsel regarding the Separation Agreement specifically, and the circumstances surrounding her termination in general. Given the reference in the Separation Agreement to the severance payment being offered "consistent with practice," Ms. Rodriguez was advised to obtain a copy of the policy upon which the severance payment was based so counsel could properly assess whether the offer presented to Ms. Rodriguez was in fact compliant with NG's policies and the law.

69. Ms. Rodriguez sent an email requesting the policy from Ms. Freeman-Evans. Ms. Freeman-Evans tersely referred Ms. Rodriguez to Paragraph 1 of the Separation Agreement that states the amount of the severance being offered.

70. Believing that Ms. Freeman-Evans was simply confused about what Ms. Rodriguez was requesting, undersigned counsel emailed Ms. Freeman-Evans on April 24 to ask for NG's written severance policy in order to effectively assist Ms. Rodriguez.

71. Ms. Freeman-Evans did not respond. Instead, on April 27, undersigned counsel received an email from Megan Edwards, Esq. (Senior Vice President and Senior Associate General Counsel), stating that NG's severance practices are "confidential."

72.   Undersigned counsel responded that NG's written policies are not confidential as to those
      to whom they apply, including Ms. Rodriguez, and also that they are subject to ERISA.

73.   On April 29, Ms. Edwards wrote back that NG's severance policy is not governed by
      ERISA.

74.   On May 15, 2015, undersigned counsel notified Brooke Runnette, Gary Knell (President
      and CEO of NG), John M. Fahey, Jr. (Chairman of the NG Board of Trustees), Terrence
      B. Adamson, Esq. (Chief Legal Officer and Board of Trustees Secretary), and Declan
      Moore (Chief Media Officer) that based on a thorough review of the chronology of facts,
      Mr. Hasler had Ms. Rodriguez terminated because he realized in his March 18 visit that
      she was pregnant.

75.   Ms. Edwards advised via email on May 21, 2015 that she would conduct an investigation.

76.   After numerous requests for status updates, on July 2, Ms. Edwards finally responded.
      She advised that Ms. Freeman-Evans investigation led her to conclude that the
      termination was justified.  In her response, she included additional alleged wrongdoing
      on the part of Ms. Rodriguez and even accused her of being untrustworthy.

77.   Ms. Edwards' response was defensive and based on "facts" that were inconsistent with
      the indisputable evidenced in the emails provided to Ms. Freeman-Evans immediately
      after the termination.  Several of the new justifications for termination were based on
      alleged conversations between Ms. Rodriguez and Mr. Hasler, alone.

78.   Notwithstanding the multilayered tracking system Mr. Hasler required the development
      team to use, including three online methods and daily meetings, NG claimed that on
      January 15, 2015, Mr. Hasler alerted Ms. Rodriguez that delays in compiling talent pitch
      materials were negatively impacting her team's workflow and could potentially harm

NG's business relationships. Mr. Hasler did not raise any such concern about delays in submissions of assignments on January 15. He did, however, as evidenced in emails from that day, offer praise for the recent greenlighting of *Animal Selfie* and informed Ms. Rodriguez that he had already shared *her* success with the rest of the team. The only discussion of talent submissions was Ms. Rodriguez's confirmation that she would have them ready the following week, which she did.

79. NG claims that on February 10, 2015, Mr. Hasler informed Ms. Rodriguez in person that her work was not "on par" with her colleagues' and initiated a plan in which Ms. Rodriguez would deliver three new program ideas per week. This meeting never occurred and Mr. Hasler's "plan" never existed; therefore, it is impossible for Ms. Rodriguez to have failed to follow through with it.

80. NG, Jeff Hasler, and Tia Freeman-Evans unlawfully terminated Ms. Rodriguez's employment because she was pregnant. Thereafter, when Ms. Rodriguez would not sign a release and accept the offered severance agreement, Ms. Freeman-Evans and Mr. Hasler engaged in defamatory and retaliatory action against Ms. Rodriguez.

81. NG and Ms. Freeman-Evans have violated ERISA by failing to provide Ms. Rodriguez's information regarding NG's pension plan and severance plan, both of which Ms. Rodriguez is a plan participant and beneficiary.

## Count One
## Discrimination Based On Pregnancy – Violation of D.C. Code Ann. § 2-1401.05(a) – NG

82. Paragraphs 1-81 are incorporated herein.

83. It is unlawful discrimination for an employer to discharge "or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment… " based on the individual's sex. D.C. Code Ann. § 2-1401.11(a)(1).

84. Sex discrimination includes discrimination on the basis of pregnancy. D.C. Code Ann. § 2-1401.05(a).

85. It is also unlawful to terminate an employee or deprive an employee of the terms, conditions, or privileges of employment "for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason." D.C. Code Ann. § 2-1402.31(b).

86. Mr. Hasler became aware of Ms. Rodriguez's pregnancy during their monthly March meetings March 17 and 18, 2015. From that time, until their next monthly meeting held April 16, 2015, Mr. Hasler prepared his trumped up charges against Ms. Rodriguez to justify the termination.

87. Ms. Krozek, Mr. Feur, and/or Mr. Hasler, were more or equally responsible for the budget flaws in the *Mission Critical* model and for the failure to secure talent for the Travel Channel but they were not terminated for their contributions to the issues because they, unlike Ms. Rodriguez, were not pregnant.

88. Ms. Freeman-Evans, who is not pregnant, failed to conduct a thorough investigation and refused to provide Ms. Rodriguez, after being asked to do so, with information about the applicable severance and pension plans; yet, she remains employed by NG.

89. NG discriminated against Ms. Rodriguez by terminating her employment because she was pregnant.

WHEREFORE, Ms. Rodriguez requests that judgment be entered against NG and that Ms. Rodriguez be awarded punitive damages; backpay and frontpay based on a termination date of April 16, 2015; the monetary equivalent of accrued but unused maternity leave, sick leave, annual leave, retirement benefits, annuities, health benefits, and every other

normal and usual employee benefit lost from the period beginning April 16, 2015; and

damages for embarrassment, humiliation, and indignity; totaling an amount to be proven

at trial, plus prejudgment interest, post judgment interest, attorneys' fees and costs and

any other relief deemed appropriate.

**Count Two**
**Discrimination Based On Pregnancy – Violation of D.C. Code Ann. § 2-1401.05(a) – Jeff**
**Hasler**

90.  Paragraphs 1-89 are incorporated herein.

91.  Mr. Hasler is an "employer" as defined by D.C. Code Ann. § 2-1401.02(10) and is

     subject to suit in his individual capacity.

92.  Mr. Hasler discriminated against Ms. Rodriguez by acting on behalf of NG and

     terminating her employment based on her pregnancy.

WHEREFORE, Ms. Rodriguez requests that judgment be entered against Mr. Hasler in his

     individual and personal capacity and that Ms. Rodriguez be awarded compensatory and

     punitive damages; and damages for embarrassment, humiliation, and indignity; totaling

     an amount to be proven at trial, plus prejudgment interest, post judgment interest,

     attorneys' fees and costs and any other relief deemed appropriate.

**Count Three**
**Aiding and Abetting Unlawful Discrimination – Violation of D.C. Code Ann. § 2-1402.62 –**
**Jeff Hasler**

93.  Paragraphs 1-92 are incorporated herein.

94.  Under § 2-1402.62 of the D.C. Human Rights Act, it is "an unlawful discriminatory

     practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts

     forbidden under" the D.C. Human Rights Act.

95.    Mr. Hasler aided NG's discriminatory termination of Ms. Rodriguez by initiating the

termination meeting and concocting false justifications for firing her.

96.    Ms. Rodriguez was terminated due to her pregnancy.

WHEREFORE, Ms. Rodriguez requests that judgment be entered against Mr. Hasler in his

individual and personal capacity and that Ms. Rodriguez be awarded compensatory and

punitive damages; and damages for embarrassment, humiliation, and indignity; totaling

an amount to be proven at trial, plus prejudgment interest, post judgment interest,

attorneys' fees and costs and any other relief deemed appropriate.

### Count Four
### Aiding and Abetting Unlawful Discrimination – Violation of the D.C. Code Ann. § 2-1402.62 – Tia Freeman-Evans

97.    Paragraphs 1-96 are incorporated herein.

98.    Ms. Freeman-Evans aided in the discriminatory termination of Ms. Rodriguez by

facilitating the April 16, 2015 meeting and refusing to conduct a thorough investigation

when presented with new information from Ms. Rodriguez.

99.    Ms. Freeman-Evans attempted to intimidate Ms. Rodriguez into signing a release that

would prevent her from pursuing a claim of wrongful termination based on pregnancy by

leading Ms. Rodriguez to falsely believe that she would not be qualified for

unemployment benefits.

100.   Ms. Freeman-Evans aided in the discriminatory termination of Ms. Rodriguez by

preparing a dishonest and contrived investigation report to justify her and Mr. Hasler's

wrongdoing.

WHEREFORE, Ms. Rodriguez requests that judgment be entered against Ms. Freeman-Evans in

her individual and personal capacity and that Ms. Rodriguez be awarded compensatory

and punitive damages; and damages for embarrassment, humiliation, and indignity; totaling an amount to be proven at trial, plus prejudgment interest, post judgment interest, attorneys' fees and costs and any other relief deemed appropriate.

**Count Five**
**ERISA Violation for Failing to Provide Required Documents to Plaintiff Upon Request**
**Tia Freeman-Evans/NG**

101.   Paragraphs 1-100 are incorporated herein.

102.   NG's pension policy is regulated by the Employee Retirement Income Security Act of 1974 ("ERISA").

103.   Ms. Freeman-Evans is the administrator of NG's pension policy.

104.   Any administrator who fails or refuses to provide any information which such administrator is required by ERISA to furnish to a participant within 30 days after such request may be held personally liable to such participant in the amount of $110 per day from the date of such failure or refusal.  ERISA § 502(c)(1).

105.   Ms. Freeman-Evans refused to provide Ms. Rodriguez with information pertaining to Ms. Rodriguez's pension fund when requested in the termination meeting on April 16, 2015.

WHEREFORE, Ms. Rodriguez requests that judgment be entered against Ms. Freeman-Evans; that Ms. Freeman-Evans be ordered to provide all information regarding Ms. Rodriguez's pension; and damages be awarded to Ms. Rodriguez against Ms. Freeman-Evans in her individual and personal capacity in the amount of $110 per day, beginning April 16, 2015, plus prejudgment interest, post judgment interest, attorneys' fees and costs and any other relief deemed appropriate.

## Count Six
## ERISA Violation for Failing to Provide Required Documents to Plaintiff Upon Request
## Tia Freeman-Evans/NG

106. Paragraphs 1-106 are incorporated herein.

107. NG's severance policy is regulated by the Employee Retirement Income Security Act of 1974 ("ERISA").

108. Ms. Freeman-Evans is the administrator of NG's severance policy.

109. Any administrator who fails or refuses to provide any information which such administrator is required by ERISA to furnish to a participant within 30 days after such request may be held personally liable to such participant in the amount of $110 per day from the date of such failure or refusal.  ERISA § 502(c)(1).

110. Ms. Freeman-Evans, in her capacity as plan administrator, has refused to provide NG's severance policy upon request by Ms. Rodriguez and undersigned counsel since April 27, 2015.

WHEREFORE, Ms. Rodriguez requests that judgment be entered against Ms. Freeman-Evans; that Ms. Freeman-Evans be compelled to disclose NG's severance policy; and damages be awarded to Ms. Rodriguez against Ms. Freeman-Evans in her individual and personal capacity in the amount of $110 per day, beginning April 27, 2015, plus prejudgment interest, post judgment interest, attorneys' fees and costs and any other relief deemed appropriate.

Respectfully submitted,
LPP Law

Lynn Perry Parker, Esq.
DC Bar #422004
111 Rockville Pike, Suite 400
Rockville, Maryland 20850

(o) 301-444-4513
(f) 301-279-7138
LParker@LPP-Law.com
*Counsel for Plaintiff*

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

Civil Division
Civil Actions Branch

| | | |
|---|---|---|
| ABIGAIL RODRIGUEZ | ) | |
| 11002 Stillwater Avenue | ) | |
| Kensington, Maryland 20895 | ) | |
|     *Plaintiff* | ) | |
| | ) | |
| | ) | Case No. __2015 CA 006067 B__ |
| v. | ) | |
| | ) | |
| NATIONAL GEOGRAPHIC SOCIETY | ) | |
| 1145 17th Street NW | ) | |
| Washington, DC 20036 | ) | |
|     *Defendant* | ) | |
| | ) | |
| JEFF HASLER | ) | |
| 1145 17th Street NW | ) | |
| Washington, DC 20036 | ) | |
|     *Defendant* | ) | |
| | ) | |
| TIA FREEMAN-EVANS | ) | |
| 1145 17th Street NW | ) | |
| Washington, DC 20036 | ) | |
|     *Defendant* | ) | |
| | ) | |

## **JURY DEMAND**

Plaintiff requests a trial by jury as to all triable counts in the Complaint.

Respectfully submitted,

LPP Law

Lynn Perry Parker, Esq.
DC Bar #422004
111 Rockville Pike, Suite 400
Rockville, Maryland 20850
(o) 301-444-4513
(f) 301-279-7138
LParker@LPP-Law.com
*Counsel for Plaintiff*

23

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Abigail Rodriguez

Case Number: **2015 CA 006067 B**

vs

Date: August 7, 2015

National Geographic Society, Inc. et al ☐ One of the defendants is being sued in their official capacity.

| Name: *(Please Print)*<br>Lynn Perry Parker, Esq. | Relationship to Lawsuit |
|---|---|
| Firm Name:<br>LPP Law | ☒ Attorney for Plaintiff |
| | ☐ Self (Pro Se) |
| Telephone No.:          Six digit Unified Bar No.:<br>301-444-4513          422004 | ☐ Other: _____ |

TYPE OF CASE:  ☐ Non-Jury       ☒ 6 Person Jury       ☐ 12 Person Jury

Demand: $ $100,000+                                    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____ Judge:_____ Calendar #:_____

Case No.:_____ Judge:_____ Calendar#:_____

---

NATURE OF SUIT:      *(Check One Box Only)*

**A. CONTRACTS**

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 15 Special Education Fees
☐ 10 Mortgage Foreclosure/Judicial Sale

☐ 07 Personal Property
☐ 09 Real Property-Real Estate
☐ 12 Specific Performance
☒ 13 Employment Discrimination

**COLLECTION CASES**

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 16 Under $25,000 Consent Denied
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 18 OVER $25,000 Consent Denied

**B. PROPERTY TORTS**

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass
☐ 06 Traffic Adjudication

**C. PERSONAL TORTS**

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 09 Harassment
☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile, Not Malpractice)

☐ 17 Personal Injury- (Not Automobile, Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

---

SEE REVERSE SIDE AND CHECK HERE ☐ IF USED

CV-496/Oct 14

# Information Sheet, Continued

**C. OTHERS**

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 04 Condemnation (Emin. Domain)
- [ ] 05 Ejectment
- [ ] 07 Insurance/Subrogation
  Under $25,000 Pltf.
  Grants Consent
- [ ] 08 Quiet Title
- [ ] 09 Special Writ/Warrants
  (DC Code § 11-941)

- [ ] 10 T.R.O./ Injunction
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment
- [ ] 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability
- [ ] 24 Application to Confirm, Modify,
  Vacate Arbitration Award
  (DC Code § 16-4401)

- [ ] 25 Liens: Tax/Water Consent Granted
- [ ] 26 Insurance/ Subrogation
  Under $25,000 Consent Denied
- [ ] 27 Insurance/ Subrogation
  Over $25,000 Pltf. Grants Consent
- [ ] 28 Motion to Confirm Arbitration
  Award (Collection Cases Only)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 30 Liens: Tax/ Water Consent Denied
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower
- [ ] 34 Insurance/Subrogation
  Over $25,000 Consent Denied

**II.**

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
  Certificate

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-1519 (a)]
- [ ] 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- [ ] 21 Petition for Subpoena
  [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a) (1)
  (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

_____
Attorney's Signature

8/9/15
_____
Date



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

ABIGAIL RODRIGUEZ

Vs.                                                                      C.A. No.        2015 CA 006067 B

NATIONAL GEOGRAPHIC SOCIETY et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge RONNA L BECK
Date:   August 10, 2015
Initial Conference: 9:30 am, Friday, November 06, 2015
Location:   Courtroom 219
            500 Indiana Avenue N.W.

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc